**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 12-cv-01415-CMA-MEH

DENNIS L. MULHOLLAND, and
ROBERT L. MEUSCH,

     Plaintiffs,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION,
as Receiver for Bank of Choice, #10380,

     Defendant.

---

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

This matter is before the Court on cross-motions for summary judgment filed by Plaintiffs Dennis Mulholland and Robert Meusch (Doc. # 32), and Defendant Federal Deposit Insurance Corporation ("FDIC") (Doc. # 30).

## I. BACKGROUND

This case arises from Executive Salary Continuation Agreements ("Agreements") between Plaintiffs and their former employer, Bank of Choice ("Bank"). Several years after Plaintiffs entered into those Agreements, the FDIC became the Bank's receiver and disaffirmed them. Plaintiffs then filed claims with the FDIC seeking damages arising from the disaffirmed Agreements. The FDIC disallowed those claims.

On May 31, 2012, Plaintiffs timely filed suit against the FDIC in this Court, seeking damages arising from the disallowance of their claims. (Doc. # 1.) Both

Plaintiffs and the FDIC filed motions for summary judgment on July 1, 2013. (Doc. ## 30; 32.)[1] The motions are ripe for the Court's review.[2] In addition, the Court considers argument made at a hearing held on these motions, as well as supplemental briefing ordered by the Court at that hearing. *See* (Doc. ## 52, 53, 54.)

**A.    UNDISPUTED FACTS**

    1.    The Agreements

Each Plaintiff entered into his Agreement in 2004. (Doc. ## 29-1, 29-2.) Under identical provisions in those Agreements, the Bank agreed to make post-termination benefit payments to each Plaintiff so long as the Bank had not fired him "for cause." (Doc. ## 29-1 at 3-5; 29-2 at 3-5.) The Agreements described these "salary continuation benefits" as "fringe benefits" unrelated to a salary reduction plan or deferred compensation. (Doc. # 29-1 at 2.) They also required the Bank to "establish an accrued liability retirement account for [each Plaintiff] into which appropriate reserves [would] be accrued." (*Id.* at 3.) Moreover, "during the terms of [each Agreement]" each Plaintiff would be "one hundred percent (100%) vested in an amount equal to the Bank's accrued liability account balance." (*Id.*)

The amount each Plaintiff was to receive from the Bank depended on the circumstances of his termination. Retirement from continuous employment with the Bank at age sixty-five would entitle Mr. Meusch to an "annual benefit" of $60,000 (*Id.*),

---

[1] Due to a software malfunction, Plaintiffs' initial summary judgment motion was incomplete (Doc. # 29), and a complete version was filed on July 8, 2013 (Doc. # 32).

[2] With respect to Plaintiffs' motion, the FDIC filed an objection to Plaintiffs statement of facts and a response on August 1, 2012, (Doc. ## 35; 36), and Plaintiffs replied on August 14, 2013 (Doc. # 38). With respect to the FDIC's motion, Plaintiff responded on July 19, 2013, (Doc. # 33), and the FDIC replied on August 5, 2013 (Doc. # 37).

and Mr. Mulholland to an "annual benefit" of $40,000 (Doc. # 29-2 at 3). Each Plaintiff would receive that same amount in the event that the Bank terminated him without cause before he reached sixty-five. (Doc. # 29-1 at 3-5.) In a third scenario, if either Plaintiff voluntarily terminated his employment before turning sixty-five, he would receive as "severance compensation" the accrued balance of his liability reserve account as of the termination date plus interest on the balance that accrued between the termination date and the date of payment. (*Id.* at 4.) If either Plaintiff were terminated for cause, he would receive nothing. (*Id.* at 5.) The Agreements also provided for scenarios involving each Plaintiff's death or disability. (*Id.* at 3-4.) The earliest date on which each Plaintiff could receive payment was upon reaching age sixty-five, with an exception for early or late retirement, which is not at issue here. (*Id.* at 2-5) (describing "normal retirement age" beginning of payments following retirement from continuous employment, voluntary termination, and involuntary termination).

    2.    <u>Procedural History</u>

On July 22, 2011, while Plaintiffs were employed by the Bank, the Colorado Division of Banking closed the Bank and appointed the FDIC as its receiver. (Doc. ## 30 at 2, 5; 32 at 2.) Shortly thereafter, Plaintiff Meusch voluntary resigned his position and Plaintiff Mulholland's employment was involuntarily terminated. Neither Plaintiff had reached retirement age, as defined by the Agreements. (Doc. ## 30 at 2; 33 at 2-3.) On October 17, 2011, the FDIC informed Plaintiffs that any claims they might have had against the Bank needed to be filed with the FDIC on or before October

27, 2011. (Doc. ## 30-8; 30-9.) On or about the same date, Plaintiffs filed claims with the FDIC for the accrued balance of the liability accounts associated with their respective Agreement. *See* (Doc. ## 32-3; 32-4.)

In letters dated October 19, 2011, the FDIC notified Plaintiffs that it had disaffirmed the Agreements as burdensome, as authorized by 12 U.S.C. § 1821(e). (Doc. ## 30-10; 30-11.) The letters also advised Plaintiffs of their right to file claims arising from the disaffirmance with the FDIC within ninety days. (*Id.*) On January 11, 2012, Plaintiffs' counsel emailed an FDIC representative, requesting that the FDIC honor Plaintiffs claims. (Doc. # 32-5.) In letters dated April 5, 2012, the FDIC informed Plaintiffs that it had disallowed their claims, explaining that neither Plaintiff's retirement benefits had vested when the Bank entered FDIC receivership. (Doc. ## 32-6; 32-7.) According to the letters, "the benefits remained subject to a triggering event that had not occurred as of such date (*i.e.*, the Claimant's reaching his retirement age of sixty-five (65), or dying, becoming disabled, voluntary [*sic*] terminating his employment, or having his employment involuntarily terminated without cause)." (*Id.*)

## II. STANDARD OF REVIEW

### A. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. In analyzing the evidence on a motion for summary judgment, this Court must view the factual record and draw reasonable inferences in favor of the non-moving party. *Kidd v. Taos Ski Valley, Inc.*, 88 F.3d 848, 851 (10th Cir.1996).

"There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party." *Bones v. Honeywell Int'l, Inc.,* 366 F.3d 869, 875 (10th Cir. 2004). Further, "[t]o defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise." *Id.*

## B. THIS COURT'S REVIEW OF PLAINTIFFS' CLAIMS

In their filings, Plaintiffs state that the FDIC did not argue that the Agreements constitute prohibited golden parachutes until it filed its response to Plaintiffs' summary judgment motion. (Doc. # 38 at 1.) Plaintiffs also argue that the FDIC must have agreed that 12 C.F.R. § 359.7 did not bar Plaintiffs' claims because the FDIC did not cite or refer to the regulation in the letters disallowing their claims. (Doc. # 33 at 6.) As such, Plaintiffs appear to argue that the FDIC cannot rely on grounds not discussed in its administrative letters.

It is a long established rule that a court may uphold an administrative order **only** upon the same grounds as the agency relied upon in making that administrative order. *See, e.g., Southern Utah Wilderness Alliance v. Office of Surface Mining Reclamation & Enforcement*, 620 F.3d 1227, 1236 (10th Cir. 2010) (emphasis added) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943)). In this case, however, the Court is not deciding whether to uphold an administrative order. Following the FDIC receiver's disallowance of Plaintiffs' claims, Plaintiffs had the choice either to seek administrative review or to file suit on the claim in federal court. *See* 12 U.S.C. § 1821(d)(6). Plaintiffs

chose to file suit on their claims in federal court, which initiated a new lawsuit. Consequently, the Court is not deciding whether to uphold the FDIC's orders disallowing Plaintiffs' claims. Instead, the Court determines *de novo* whether Plaintiffs may recover damages on their claims. *See id.* ("claimant may request administrative review of the claim . . . or file suit . . . ."); *see also Bank of America National Association v. Colonial Bank*, 604 F.3d 1239, 1247 (11th Cir. 2010) ("statutory right to *de novo* review in federal district court"). Thus, the Court is free to consider any arguments properly raised in this proceeding by the parties and is not limited to the reasons that the FDIC stated in disallowing Plaintiffs' claims.

"Although an agency's interpretation or application of a statute is a question of law reviewed *de novo*, the Court must give deference to the agency's construction of a statutory provision it is charged with administering." *Knyal v. Officer of Comptroller of Currency*, No. C 02-2851, 2003 WL 26465939, *10 (N.D. Cal. 2003) (slip copy) (citing *Bear Lake Watch, Inc. v. FERC,* 324 F.3d 1071, 1073 (9th Cir. 2003); *Brower v. Evans,* 257 F.3d 1058, 1065 (9th Cir. 2001); *Eisinger v. F.LR.A.,* 218 F.3d 1097, 1100-01 (9th Cir. 2000)); *see also Lockheed Martin Corp. v. Admin. Review Bd., U.S. Dep't of Labor*, 717 F.3d 1121, 1131 (10th Cir. 2013). When a statute is silent or ambiguous on a particular point, the court may defer to the agency's interpretation. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 843 (1984). Review is limited to whether the agency's conclusion is based on a permissible construction of the statute. *Id.*

## III. DISCUSSION

The Court may grant summary judgment in Plaintiffs' favor only if the undisputed facts show that: (1) the Agreements do not fall within an exception for golden parachutes, and (2) 12 C.F.R. § 359.7 does not bar Plaintiffs' claims. The Court will address each issue in turn.

### A.    WHETHER THE AGREEMENTS ARE PROHIBITED GOLDEN PARACHUTE PAYMENTS

Pursuant to its statutory authority, *see* 12 U.S.C. § 1828(k), subject to certain exceptions, the FDIC has prohibited insured depository institutions and their holding companies from "mak[ing] or agree[ing] to make any golden parachute payment." 12 C.F.R. § 359.2. 12 U.S.C. § 1828(k) defines a golden parachute, in relevant part, as

> any payment (or any agreement to make any payment) in the nature of compensation by any insured depository ... for the benefit of any institution-affiliated party[3] pursuant to an obligation of such institution ... that—
>
> (i) is contingent on the termination of such party's affiliation with the institution or covered company; and—
>
> (ii) is received on or after the date on which—
>
> ...
>
> (II) any conservator or receiver is appointed for such institution.

12 U.S.C. § 1828(k)(4)(A); *see also* 12 C.F.R. 359.1(f)(1).

---

[3] Under 12 C.F.R § 359.1(h)(1), an institution-affiliated party ("IAP") is defined as, among others, "[a]ny director, officer, employee, or controlling stockholder (other than a depository institution holding company) of, or agent for, an insured depository institution or depository institution holding company." It is undisputed that Plaintiffs meet this definition.

The FDIC argues that the payments Plaintiffs seek are prohibited golden parachutes. Plaintiffs do not contest that the Agreements meet this definition, and the undisputed facts demonstrate that they do. However, Plaintiffs argue that the payments are "bona fide deferred compensation plans or agreements" ("BFDCP") and, thus, are excluded from the "golden parachute" prohibition. *See* 12 C.F.R. § 359.2(f)(2)(iii).

Pursuant to 12 U.S.C. § 1828(k)(4)(C), the FDIC is empowered to exclude from the definition of a golden parachute payment "any payment made pursuant to a [BFDCP] which [it] determines, by regulation or order, to be permissible." *See also* 12 C.F.R. 359.1(f)(2)(iii). A BFDCP includes "any plan, contract, agreement, or other arrangement whereby:

> . . .
>
> (2) An insured depository institution . . . establishes a nonqualified deferred compensation or supplemental retirement plan, other than an elective deferral plan described in (e)(1) of this section:
>
> > . . .
> >
> > (ii) Primarily for the purpose of providing supplemental retirement benefits or other deferred compensation for a select group of directors, management or highly compensated employees (excluding severance payments described in paragraph (f)(2)(v) of this section and permissible golden parachute payments described in § 359.4) . . . .

12 C.F.R. § 359.1(d)(2). The Agreements state that they create an "unfunded arrangement maintained **primarily to provide supplemental retirement benefits** for the Executive." (Doc. ## 29-1 at 1; 29-2 at 1) (emphasis added). The Agreements describe Plaintiffs as "valued Executive[s]" who have performed services of "exceptional merit." In light of each Plaintiff's "experience, knowledge . . . , reputation, and contacts

8

in the industry," the Bank entered into the contracts in an effort to retain his services for the remainder of his career. (Doc. # 29-1 at 1.) Accordingly, the Court finds, and the parties concede, that the undisputed facts demonstrate that the Agreements meet the first two requirements of a BFDCP.

In addition, in order to qualify as a BFDCP, the Agreements must meet the seven requirements outlined in 12 C.F.R. § 359.1(d)(3). During oral argument, the FDIC confessed that it disputes only whether the second and sixth requirements of Subpart 359.1(d)(3) are met. The Court addresses in turn each of the seven requirements in 12 C.F.R. § 359.1(d)(3), along with the corresponding undisputed facts that support those requirements.

> (i) The plan was in effect at least one year prior to any of the events described in paragraph (f)(1)(ii) of this section[4];

It is undisputed that Plaintiffs entered into the Agreements in 2004, more than six years before the Bank entered FDIC receivership. *See* (Doc. ## 29-1; 29-2); 12 C.F.R. § 359.1(d)(3)(i).

> (ii) Any payment made pursuant to such plan is made in accordance with the terms of the plan as in effect no later than one year prior to any of the events described in paragraph (f)(1)(ii) of this section and in accordance with any amendments to such plan during such one year period that do not increase the benefits payable thereunder;

The FDIC argues that the words "one year" reference the timing of "any payments", rather than "any of the events" or "any amendments". However, a plain reading of the regulation demonstrates that the "one year" limitation does not refer to

---

[4] 12 C.F.R. § 359.1(f)(1)(ii) includes, as relevant here, the "appointment of any conservator or receiver."

the payment itself—it refers to "any of the events" (which include, *inter alia*, the appointment of a receiver) and "any amendment" to the plan. The FDIC argues that this interpretation renders redundant the additional requirement that the Agreement be "in effect at least one year prior to [the FDIC's appointment as receiver]." *See* 12 CFR § 359.1(d)(3)(i). However, it is possible that a plan could be in effect more than one year prior to receivership, but changes are made to some, but not all of the plan's terms within the year prior to receivership. Hence, the requirement that payments are made "in accordance with the terms of the plan as in effect no later than one year prior to" the date that the Bank entered into receivership, is a further limitation and not redundant. Because neither Agreement was amended in the year prior to receivership (Doc. ## 29-1; 29-2), this requirement is met. *See* 12 C.F.R. § 359.1(d)(3)(ii).

> (iii) The IAP has a vested right, as defined under the applicable plan document, at the time of termination of employment to payments under such plan;

The Agreements meet this requirement. The terms state that, "during the terms of this agreement" Plaintiffs' rights "vested in an amount equal to the Bank's accrued liability account balance." *See* (Doc. ## 29-1; 29-2); 12 C.F.R. § 359.1(d)(3)(iii).

> (iv) Benefits under such plan are accrued each period only for current or prior service rendered to the employer (except that an allowance may be made for service with a predecessor employer);

Plaintiffs assert, and the FDIC does not dispute, that the benefits accrued only for current or prior service, as evidenced by the Bank's former Assistant CFO Scott Horton's deposition testimony, which is supplemented by documentary evidence, including financial and liability statements. Horton explained that Plaintiffs' liability

balances accrued monthly, beginning on Plaintiffs' respective plan implementation dates through July 2011, when the Bank entered receivership. (Doc. # 53-1 at 14-17, 61); *see* 12 C.F.R. § 359.1(d)(3)(iv).

> (v) Any payment made pursuant to such plan is not based on any discretionary acceleration of vesting or accrual of benefits which occurs at any time later than one year prior to any of the events described in paragraph (f)(1)(ii) of this section;

Plaintiffs assert, and the FDIC agrees, that there is no indication that these payments would be based on any discretionary acceleration of vesting or accrual. *See* 12 C.F.R. § 359.1(d)(3)(v).

> (vi) The insured depository institution or depository institution holding company has previously recognized compensation expense and accrued a liability for the benefit payments according to [Generally Accepted Accounting Principles ("GAAP")] or segregated or otherwise set aside assets in a trust which may only be used to pay plan benefits, except that the assets of such trust may be available to satisfy claims of the institution's or holding company's creditors in the case of insolvency; and

The FDIC argues that "the record is devoid of any evidence that the Bank recognized any compensation expense to [] Plaintiff's relating to the [] Agreements, [because] Plaintiffs were not eligible for and never received any benefits from the Bank prior to its insolvency." (Doc. # 54 at 14.) However, Plaintiffs have provided the Bank's liability statements, which reflect the accrued balances of each Plaintiff's benefits under the Agreements. Those statements reflect that the Bank accounted for a liability of $403,381 for Plaintiff Mulholland, and $74,849 for Plaintiff Meusch as of July 2011, the time in which the Bank entered receivership and each Plaintiff's employment was terminated. (Doc. # 53-1 at 14-17, 61.) These statements demonstrate that the Bank

11

"recognized compensation expense and accrued a liability for the benefit payments" and despite the FDIC's urging, there is no genuine dispute as to these facts. Moreover, the FDIC has not contested that these liabilities accrue and are expensed according to GAAP. *Cf.* (Doc. # 53-2) (affidavit of Scott Rulon, CPA, stating that GAAP requires the use of an accrual method of accounting and that the liability is expensed). Accordingly, Plaintiffs have met this requirement. *See* 12 C.F.R. § 359.1(d)(3)(vi).

> (vii) Payments pursuant to such plans shall not be in excess of the accrued liability computed in accordance with GAAP.

The parties agree that the undisputed facts demonstrate that this requirement is met. (Doc. # 52 at 18); *see* 12 C.F.R. § 359.1(d)(3)(vii).

The undisputed facts demonstrate that the Agreements are golden parachutes, as defined by 12 C.F.R.§ 359.1(f)(1), but meet the BFDCP exception, as defined in 12 C.F.R. § 359.1(d). Therefore, the Court must next determine whether 12 C.F.R. § 359.7 relieves the FDIC from an obligation to pay damages arising from the disaffirmed Agreements.

### B. WHETHER 12 C.F.R. § 359.7 RELIEVES THE FDIC OF AN OBLIGATION TO PAY DAMAGES ARISING FROM THE DISAFFIRMED AGREEMENTS

1. Authority To Adopt 12 C.F.R. § 359.7

As a threshold matter, the Court must address whether the FDIC had legal authority to adopt 12 C.F.R. § 359.7, or if that regulation was beyond the scope of FDIC's authority to prohibit financial institutions from entering into golden parachute agreements. Subpart 359.7 applies beyond golden parachutes—encompassing "other

agreements," including, as argued here, an agreement that is excluded from the definition of a golden parachute because it is a BFDCP.

The Court agrees with the FDIC that through the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA")[5], Congress authorized the FDIC-R[6], to "disaffirm or repudiate **any** contact" that the receiver determines, in its discretion, to be burdensome toward "promot[ing] the orderly administration of the institution's affairs." 12 U.S.C. § 1821(e) (emphasis added). Following the passage of FIRREA, Congress passed the Banking Law Enforcement Act of 1990, which enhanced FDIC-C's authority to regulate or prohibit golden parachute and indemnification payments. *See* 18 U.S.C. § 1828(k). This grant of authority, however, was not intended to "effect or alter . . . any other authority the agencies may have under existing law and regulations." 136 Cong. Rec. E3684-02, 1990 WL 206971; *see further* 12 U.S.C. § 1821(d)(2)(J)(i) (granting the FDIC "such incidental powers as shall be necessary to carry out [its powers as receiver]"). Accordingly, pursuant to FIRREA, FDIC-R maintained the ability to repudiate burdensome contracts, including those that FDIC-C may have approved prior to the institution's insolvency. *See* 12 U.S.C. § 1821(e); 12 C.F.R. § 359.7 ("Any

---

[5] "Congress enacted FIRREA in 1989 in response to the precarious financial condition of the nation's banks and savings and loan institutions. FIRREA grants broad powers to the FDIC to "deal expeditiously with failed financial institutions. Upon its appointment as receiver, the FDIC succeeds to all rights, titles, powers, and privileges of the insured depository institution, along with the duty to pay all valid obligations of the insured depository institution." *FirsTier Bank, Kimball, Neb. v. F.D.I.C.,* 935 F. Supp. 2d 1109, 1116 (D. Colo. 2013) (internal citations and quotation marks omitted).

[6] Distinct from the FDIC-C, the agency's corporate capacity in which it functions as a bank regulator and insurer of bank deposits, the FDIC-R steps in to administer, as receiver or conservator, the assets of receivership estates of failed institutions. *See FDIC v. Bank of Boulder*, 911 F.2d 1466, 1473 (10th Cir. 1990), *cert denied*, 499 U.S. 904 (1991); 12 U.S.C. §§ 1821(d)(2), 1821(i)(2).

consent or approval granted under the provisions of this part by the FDIC . . . shall not in any way obligate such agency or receiver to pay any claim or obligation pursuant to any golden parachute, severance, indemnification, or other agreement.") Thus, pursuant to FIRREA, Congress authorized FDIC-R to promulgate Subpart 359.7, including the ability to disaffirm agreements that would, absent receivership, be excluded or exempted from the golden parachute definition. *See* 12 U.S.C. § 1821(e).

Plaintiffs argue that it would be "counterintuitive" if one subpart of Section 359 were to allow certain agreements that would otherwise constitute prohibited golden parachutes, while another subpart prohibited the same agreement. (Doc. # 38 at 7.) The Court disagrees. Section 359's subparts, which define, proscribe, and allow certain golden parachute payments, apply outside of the receivership context. *See* 12 C.F.R. §§ 359.1, 359.2, and 359.4. In contrast, Subpart 359.7 applies "in the event of receivership" and bars certain claims only "when the FDIC is appointed as receiver for any depository institution." Read together, these subparts represent the FDIC's choice to permit insured depository institutions to enter into BFDCAs while reserving the FDIC's authority, if it becomes the institution's receiver, to repudiate or disaffirm those agreements and avoid the obligation to pay the benefits those agreements promise. *See Cross-McKinley v. F.D.I.C.*, No. CV 211-172, 2013 WL 870309, *7 (S.D. Ga. 2013) ("the FDIC, through its regulations, has interpreted 12 U.S.C. § 1821(e)(3)(A) to mean that claims for golden parachute benefits after the receiver's appointment and disaffirmance of a contract are not recoverable.").

This is reasonable, not counterintuitive, particularly in light of Congress's explanation that 12 U.S.C. § 1828(k) "is intended to provide the [FDIC] with the necessary authority to prevent officers and directors of insured institutions or holding companies from voting themselves generous bonuses at the expense of the institution or company, and ultimately, perhaps, the [FDIC] . . . ." 136 Cong. Rec. E3684-02, 1990 WL 206971. Indeed, these changes were made "to provide a means of preventing executives who have been terminated from depository institutions from draining money from those institutions, to the detriment of shareholders and creditors, or in the case of failed institutions, to the detriment of the FDIC." *Kynal*, 2003 WL 26465939, at *14. Accordingly, the Court finds that the FDIC had authority to promulgate Subpart 359.7.

2. Whether Subpart 359.7 Bars Plaintiffs' Recovery

The Court next addresses the FDIC's argument that, even if Plaintiffs demonstrate that the Agreements are BFDCPs, it has no obligation to pay to Plaintiffs the damages associated with their disaffirmed agreements in light of Subpart 359.7. FIRREA authorizes the FDIC, when acting as a receiver of a financial institution, to disaffirm or repudiate contracts it deems burdensome, provided that the disaffirmance of the contract "will promote the orderly administration of the institution's affairs." 12 U.S.C. § 1821(e)(1). Once a contract is disaffirmed, the FDIC's action "is treated as a breach of contract giving rise to an ordinary contract claim for damages." *WRH Mortg., Inc. v. S.A.S. Assocs.*, 214 F.3d 528, 532 (4th Cir. 2000). FIRREA limits recoverable damages to "actual direct compensatory damages," which are "determined

15

as of the date of the appointment of the . . . receiver," 12 U.S.C. § 1821(e)(3)(A).

Subpart 359.7 states:

> The provisions of this part, or any consent or approval granted under the provisions of this part by the FDIC (in its corporate capacity), shall not in any way bind any receiver of a failed insured depository institution. Any consent or approval granted under the provisions of this part by the FDIC or any other federal banking agency shall not in any way obligate such agency or receiver to pay any claim or obligation pursuant to any golden parachute, severance, indemnification or other agreement. Claims for employee welfare benefits or other benefits which are contingent, even if otherwise vested, when the FDIC is appointed as receiver for any depository institution, including any contingency for termination of employment, are not provable claims or actual, direct compensatory damage claims against such receiver.

12 C.F.R. § 359.7.

The FDIC argues that two portions of this regulation give it independent authority to deny payments to Plaintiffs. First, the FDIC argues that it is not obligated to make payments because the Agreements are "other agreements". However, as is apparent from a plain reading of the regulation, that portion of the regulation merely addresses cases in which "consent or approval" has been granted under Subpart 359. In those instances, "consent or approval" does not create an obligation for the receiver "to pay any claim or obligation" arising from "any golden parachute, severance, indemnification or other agreement." *See* 12 C.F.R. § 359.7. However, in the instant case, neither party asserts that the "FDIC or any federal banking agency" granted "consent or approval." *Cf.* 12 C.F.R. 359.4(a) (certain golden parachute payments are permitted if the financial institution seeks and receives the FDIC's consent); *see further Erwin v. FDIC,* No. 10-cv-9467, 2013 WL 1811924, *4 (S.D.N.Y. 2012) (certain exceptions in Subpart 359.4(a) do not apply where the parties offer no evidence the FDIC consented

in writing to the agreements; nonetheless, Subpart 359.7 bars the claims as contingent). Therefore, this portion of Subpart 359.7 is not applicable here.

Next, the FDIC argues that Plaintiffs claims are contingent and therefore not recoverable. For a plaintiff to recover damages on a disaffirmed contract, the damages claim must satisfy the common law requirement of "provability"[7] and the FIRREA requirement that the damages be "actual, direct, and compensatory." *See* 12 U.S.C. § 1821(e)(3); *McMillian v. FDIC*, 81 F.3d 1041, 1045-1056 (11th Cir. 1996). In light of these requirements, Subpart 359.7 expressly precludes recovery of damages on the claims for (1) employee welfare benefits or other benefits; (2) that are "contingent, even if otherwise vested"; (3) when the FDIC is appointed as receiver.[8] *Id.*

---

[7] Prior to FIRREA'S enactment, courts applied the common law rule of provability to determine whether bank contracts repudiated by a receiver were recoverable. *See, e.g.*, *First Empire Bank-New York v. FDIC*, 572 F.2d 1361, 1367 (9th Cir. 1978). Courts have reached differing conclusions about whether FIRREA left provability intact, codified it, incorporated it, or altered it. *See McMillian v. F.D.I.C.*, 81 F.3d 1041, 1046 n.4 (11th Cir. 1996) (collecting cases). Courts have also decried FIRREA as confusing, to say the least. *See, e.g., Marquis v. F.D.I.C.,* 965 F.2d 1148, 1151 (1st Cir. 1992) ("FIRREA's text comprises an almost impenetrable thicket, overgrown with sections, subsections, paragraphs, subparagraphs, clauses, and subclauses— a veritable jungle of linguistic fronds and brambles. In light of its prolixity and lack of coherence, confusion over its proper interpretation is not only unsurprising—it is inevitable."); *Guidry v. Resolution Trust Corp.,* 790 F. Supp. 651, 653 (E.D. La. 1992) ("[T]he statute makes the Internal Revenue Code look like a first grade primer.") Because both parties cite provability case law, apparently on the assumption that the provability test survived FIRREA, it is not necessary to decide whether provability survived FIRREA's enactment. *See McMillian*, 81 F.3d at 1046 n.4

[8] Plaintiffs cite several cases to analogize their agreements to severance payments. *See, e.g.*, *McMillian v. FDIC*, 81 F.3d 1041 (11th Cir. 1996); *Monrad v. FDIC*, 62 F.3d 1169 (9th Cir. 1995); *Office & Professional Employees International Union v. FDIC*, 27 F.3d 598 (D.C. Cir. 1994). However, those cases were decided prior to the promulgation of 12 C.F.R. 359 *et seq.* in 1996. *See Erwin*, 2013 WL 1811924, *4 (citing 61 Fed. Reg. 5926). Therefore, those cases did not specifically address the effect of Subpart 359.7. *See id.* (declining to follow pre-Subpart 359.7 cases and instead finding that the FDIC is not liable for damages pursuant to Subpart 359.7 when it repudiates a severance agreement). Nonetheless, those cases are distinguishable. Here, Plaintiffs do not ask for severance payments, and their claims were contingent on their

First, Plaintiffs' claims are for other benefits.  The Agreements themselves state that they are intended to provide "supplemental retirement **benefits**" for Plaintiffs.

Next, Plaintiffs make various arguments that their claims had vested when the FIDC was appointed as the Bank's receiver.  *See* (Doc. # 32).  Claims may be vested and accrued, even though the contracts contemplate payment upon the occurrence of events that had not occurred before the date of insolvency or appointment of a receiver. *See, e.g.*, *McMillian*, 81 F.3d 1041 (severance payments); *Monrad v. FDIC*, 62 F.3d 1169 (9th Cir. 1995) (same); *Office & Professional Employees International Union v. FDIC*, 27 F.3d 598 (D.C. Cir. 1994) (same); *FDIC v. Liberty Nat'l Bank & Trust Co.*, 806 F.2d 961 (10th Cir. 1986) (standby letters of credit); *First Empire Bank-New York v. FDIC*, 572 F.2d 1361 (9th Cir. 1978) (same).  The Court agrees that Plaintiffs' claims are vested: they are based on contracts in existence when the Bank entered receivership, and the Agreements expressly state that Plaintiffs were vested up to the amounts in their respective accrued liability accounts.  (Doc. ## 29-1 at 3; 29-2 at 3.) However, pursuant to 12 C.F.R. § 359.7, even a claim that is vested, if contingent, is not a provable claim.  Nor is it an actual, direct compensatory damage claim against FDIC-R.  *See Erwin*, 2013 WL 1811924, *4

The undisputed facts show that Plaintiffs' claims were contingent.  "Contingent is commonly defined as possible but not assured; doubtful or uncertain; conditioned upon the occurrence of some future event which is itself uncertain or questionable . . . ."

---

separation from the Bank, not to mention also contingent on the manner in which they separated and upon reaching the retirement age of 65 years.

*Knyal*, 2003 WL 26465939, at *14 (citing *Black's Law Dictionary* (6th ed. 1990)).  Under the Agreements, neither Plaintiff was entitled to receive any payment until he reached age sixty-five, regardless of whether Plaintiffs' employment with the Bank ended on the day the Bank entered receivership or later.  It is undisputed that, on the day the Bank entered receivership, neither Plaintiff had reached retirement age, as defined by the Agreements.  *See* (Doc. ## 30 at 2; 33 at 2).  In addition to not having reached retirement age, Plaintiffs' respective separations from the Bank had yet to occur.  The circumstances of their respective separations determine not only the amount they would be paid, but also, whether Plaintiffs would be paid at all.  Consequently, neither prior to, nor at the time of the receivership did the Bank have a current obligation to pay either Plaintiff under the Agreements.  Because the possibility of payment was based on uncertain future events, the claims were contingent, even though they were otherwise vested.  Accordingly, Plaintiffs' claims pursuant to the Agreements are "not provable claims or actual, direct, compensatory damage claims against" the FDIC.  12 C.F.R. § 359.7; *see Cross-McKinley*, 2013 WL 870309, at *4; *Erwin,* 2013 WL 1811924, *4 (Subpart 359.7 "appears to settle the question of whether the FDIC is liable for damages when it repudiates a severance agreement: it is not.").

## IV.  **CONCLUSION**

Based on the foregoing, the Court hereby GRANTS the FDIC's Motion for Summary Judgment (Doc. # 30), and DENIES Plaintiffs' Motion for Summary Judgment (Doc. # 32).  Accordingly, this case is DISMISSED WITH PREJUDICE, and the Clerk of the Court shall enter judgment in favor of Defendant and against Plaintiffs. Pursuant to

D.C.Colo.LCivR 54.1, Defendant may thereafter have its costs by filing a bill of costs within 14 days of the date of that order.  It is

FURTHER ORDERED that the final trial preparation conference, currently scheduled for June 19, 2014, and the three-day jury trial, set to begin June 30, 2014, are VACATED.

DATED:  June __09__, 2014

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge